IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JACHIN BOAZ WALLS, SR.,          *

    Plaintiff,          *

v.          *          Civil Action No. GLR-24-699

WARDEN CARLOS BIVENS et al.,          *
                                   *

    Defendants.

                                ***

## **MEMORANDUM OPINION**

Pending before the Court are Motions to Dismiss or, in the alternative, for Summary Judgment filed by Defendants Dr. Kyle Smith, Andrea Trowbridge, [1] and Dr. Christopher Brandon[2] (collectively, "Medical Defendants"), (ECF No. 21), and Defendant Warden Carlos Bivens, (ECF No. 23). Also pending before the Court is self-represented Plaintiff Jachin Boaz Walls, Sr.'s Motion to Appoint Counsel (ECF No. 16). The motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons stated below, the Court will deny Walls' Motion to Appoint Counsel. The Court will grant the Medical Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, construed as a Motion for Summary Judgment, and the Court will grant Bivens' Motion to Dismiss or, in the alternative, for Summary Judgment, construed as a Motion to Dismiss.

---

[1] Ms. Trowbridge is incorrectly named as Andrea Moss in the Complaint. The Clerk will be directed to correct the docket to reflect her actual name.

[2] Christopher Brandon is incorrectly named "Dr. Christopher Brandon." The Clerk will be directed to correct this misnomer on the docket.

# I.      BACKGROUND

## A.      <u>Walls' Allegations</u>

Walls is an inmate confined to Roxbury Correctional Institution ("RCI"). On November 5, 2023, Walls experienced severe back and hip pain, as well as right leg numbness and tingling, and shortness of breath. (Compl. Supp. at 2, ECF No. 5-4). He informed the tier officer who notified the medical staff. (<u>Id.</u>). Walls was transported via cart to the medical unit but was sent back to his unit without his pain being addressed because the medical staff did not believe his pain was severe enough to warrant intervention. (Compl. at 4). Walls explains that he suffered from back pain for years, but this pain, which began when he was working out, was more severe than any pain he had previously felt. (Compl. at 4). He states the pain began with a sharp stabbing pain in his side and right back area which then spread to his entire right side including his hip. (<u>Id.</u>). He claims he could barely walk. (<u>Id.</u>).

On November 15, 2023, Walls was issued a pass to see Dr. Smith, but he was never notified "due to an emergency code in the prison." (Compl. Supp. at 2). Although Walls submitted two sick call slips, for two weeks nothing was done. (<u>Id.</u>).

On November 29, 2023, Walls' mother contacted the prison to notify them of Walls' "extreme pain" in his back, right leg, and hip. (<u>Id.</u>). Although Walls was sent to medical again, he claims he waited for three hours and received no medication or treatment despite his pain being a "10." (<u>Id.</u>). Walls was sent back to his housing unit without a remedy for his pain. (<u>Id.</u>).

The following day Walls received another pass from Dr. Kyle Smith but was "never called again." (Id.).

On December 1, 2023, Walls began waiting for the cart to take him to medical at 6:30 p.m., and still by 10:38 p.m., nobody had come to take him.  (Id.)).  He was told that "they only had one nurse working" that night. (Id.). The following day Walls' mother, Teresa King, called the prison and talked to Captain Wally.  (Id.). Wally had Sgt. Burger check on Walls and Burger told Walls that "medical would do nothing for [him]." (Id.).

On December 5, 2023, Walls' sister, Rita Walls called Secretary of the Department of Public Safety and Correctional Services ("DPSCS") Carolyn Scruggs to complain that the medical staff was not treating Walls for his back pain. (Id.). Walls claims that the pain was causing him to have shortness of breath and tingling. (Id.).

On December 6, 2023, Walls was called to medical "to fill out release forms per the Warden's Office." (Id.). He spoke with Defendant Andrea Trowbridge about his pain, but she offered no solutions, simply stating instead that they don't give out Baclofen anymore. (Id.). Later that same day, Walls was given an injection by "Nurse Coreetta" and he was provided one 600mg tablet of Motrin. (Id.). Walls was told that if he needed more Motrin he should contact medical. (Id.).  He contacted medical the following day but he never received another dose. (Id.).

On December 8, 2023, Walls' sister called DPSCS again to inform them that his pain was not subsiding. (Id.). Later that day, at approximately 11:20 a.m., the Warden stopped by Walls' cell during his rounds; Walls could barely stand to talk to him. (Id.). At

3

approximately 4:00 p.m., Walls was seen by a doctor who ordered an x-ray and prescribed Baclofen which was started on December 10, 2023. (Id.).

On December 11, 2023, Walls was seen by "Dr. Budy." (Id.). The following day the x-ray was performed. (Id.). Some time between December 12 and 19, 2023, Walls ran out of Baclofen. (Id.).

On December 19, 2023, Andrea Trowbridge called Walls to medical, and he informed her that nothing that had been prescribed thus far was relieving his pain. (Id.). Despite that report, Walls states that there was no response provided by anyone who was in charge of medical staff. (Id.).

On December 20, 2023, Walls was seen by a doctor who prescribed "nerve meds" and sought to have an MRI approved. (Id.).

On December 22, 2023, Walls started taking Nortriptyline 25 mg. (Id.). He also saw Christopher Brandon, P.A. who assured Walls he would get the request for an MRI approved.  (Id. at 2).

On December 25, 2023, Walls began taking Prednisone. (Id. at 3).

On February 9, 2024, Walls was again prescribed Prednisone, which he describes as "only a bandaid" given in response to Wall's sick call slip stating he was still in pain. (Id.). P.A. Robert told Walls there was nothing in the system about an MRI and that he would email the regional director about it. (Id.). Walls had not heard back about the MRI as of the date he filed his complaint with this Court. (Id.).

On February 13, 2024, Walls started a five-day course of prednisone. (Id.). Walls states that on February 15, 2024, he decided to stop taking Nortriptyline because it was causing him to have blurred vision and tremors in his right hand. (Id.).

On February 21, 2024, Walls filed an informal complaint and the sick call nurse put him in to see a provider. (Id.). On February 28, 2024, Walls began to notice that all of the food he ate tasted like medicine. (Id.).

According to Walls, the pain "didn't allow [him] to walk or stand" beyond "minutes at a time." (Compl. at 5). He adds that taking a shower exacerbated his pain to a level "10." (Id.). He also claims he could lay down for only short periods of time and despite going to medical on several occasions, all he received were pain pills that did not work. (Id.). Because Walls can no longer exercise, his hypertension is adversely affected. (Id.). As relief, he seeks monetary damages. (Id.).

## B.   <u>Medical Defendants' Response</u>

Medical Defendants maintain that Walls does not have an Eighth Amendment claim because he cannot establish that the Medical Defendants were deliberately indifferent to any objectively serious medical need, and none of the Medical Defendants had the authority to attend to the alleged need. (Medical Defs.' Mem. Supp. Mot. Dismiss ["Medical Defs. Mot."] at 11–12, ECF No. 21-1). Medical Defendants provide verified medical records to support their motion which demonstrate the following chronology of events. (See ECF Nos. 21-3–21-8).

On June 2, 2023, Walls attended a chronic care appointment with Dr. Oluyemi Abiodun. (Medical Rs. Part 2 at 27–31, ECF No. 21-4). Dr. Abiodun noted that Walls'

chronic low back pain is due to "chronic wear and tear and also due to possible lipoma along spinal column." (Id. at 28). Walls rated his pain as a 6/10 and explained that the pain is exacerbated with prolonged standing with the pain being "ameliorated by pain meds in [the] past." (Id.).

An x-ray performed on July 20, 2023 showed "mild multilevel disc space height loss and facet hypertrophy and thoracic spondylitic degenerative changes." (Medical Rs. Part 5 at 18, ECF No. 21-7). The radiologist stated that a CT scan or MRI would be needed for further evaluation of worsening symptoms due to "limitation in the evaluation of spinal disease" with x-ray. (Id.; see also Medical Rs. Part 6 at 5, ECF No. 21-8).

On July 20, 2023, Walls was seen by Dr. Zohra Jahed for chronic care. (Medical Rs. Part 2 at 22–25). Dr. Jahed noted that Walls has chronic low back pain due to "chronic wear and tear." (Id. at 22). An x-ray of his lumbar and thoracic spine showed mild degenerative joint disease ("DJD") with no other abnormality. (Id.).

On October 31, 2023, Walls had a chronic care visit with Dr. Kyle Smith. (Id. at 16–19). His back pain was described as "chronic but episodic" with Walls stating he "gets pain and stiffness in his right lower back with radiation down his right leg" without any weakness or numbness. (Id. at 16). Dr. Smith asserts that this is the only encounter he had with Walls. (Smith Decl. ¶ 9, ECF No. 21-2). He recalls demonstrating stretches for Walls to perform that may help with his back pain and continued his acetaminophen, Voltaren gel, and Salonpas patches. (Id.). He explains that Walls' prescription for Baclofen was not renewed because muscle relaxers are not supposed to be prescribed for chronic pain long

term as they may be abused, or cause addiction. (Id.). Baclofen also has limited indication for spasticity such as that seen with spinal cord injuries or multiple sclerosis. (Id.).

On November 11, 2023, Walls was seen for an unscheduled Nurse Visit with Marion Reisch, RN in response to his complaint about lower back pain that he described as "sharp pain from [his] foot to [his] lower back." (Medical Rs. Part 2 at 13). Reisch noted under previous history that Walls' back was "Injured power lifting in 1998." (Id. at 14). Walls claimed that any pressure applied to his right leg causes "10/10 pain" to his right side, hip and leg with numbness and tingling.  (Id.). He walked with "guarded gait."  (Id. at 15).

On November 29, 2023, Walls was seen again for an unscheduled Nurse sick call with Reisch. (Id. at 10). Walls informed Reisch that his back pain had not improved. (Id.). Reisch noted that Walls walked to and from dispensary "with slight limp."  (Id. at 12).

On November 30, 2023, a record of a missed appointment was generated by Dr. Kyle Smith.  (Id. at 8–9).  Dr. Smith asked for the appointment to be rescheduled.  (Id. at 8).

On December 6, 2023 Walls was seen by Coretha Tassi, RN, for a sick call to address his complaints of lower right back pain, including a knot in his lower back that he reported having for six weeks. (Id. at 5). Walls also reported that his right hip was in extreme pain and that he needed an x-ray. (Id.).

On December 8, 2023, Walls had a provider visit with Yoseph Teweldebrhan, NP, addressing low back pain described as gradual onset without injury; "severity level is severe." (Id. at 1–4). The pain was described as radiating "to the right foot and right thigh." (Id.). Walls stated the pain included numbness and was a shooting pain, but he denied

having fevers, chills, night sweats, focal weakness, paresthesia, saddle anesthesia, bowel incontinence and urinary retention/incontinence. (Id.). Teweldebrhan prescribed Baclofen 10 mg, twice a day, for seven days pending a spine x-ray. (Id. at 3).

On December 13, 2023, an x-ray was performed on Walls' lumbar spine which revealed mild multilevel degenerative disc disease and facet arthrosis. (Medical Rs. Part 5 at 38). The radiologist noted the limitations of the study and recommended an MRI or CT scan if "determined clinically." (Id.).

On December 22, 2023, Walls had an urgent visit with PA Christopher Brandon, during which he complained of lower back pain that began three months prior when he felt a "twinge" during his work out. (Medical Rs. Part 1 at 28, ECF No. 21-3). Walls reported that the pain increased the next day and that he had a tingling sensation to his right thigh area. (Id.). Walls explained that he had pain like this before but it never lasted longer than a couple of weeks. (Id.). He further explained that the pain increased with movement, sitting, and laying down. (Id.). Brandon assessed Walls as follows:

> I completed a structured, evidence based clinical evaluation to screen for acute, non-traumatic spinal emergencies.  The patient has a normal detailed neurologic exam and a low red flag score.  The evidence indicates that the patient is at very low risk for an acute spinal emergency and this is consistent with my clinical intuition.  The risk of further workup is higher than the likelihood of the patient having a spinal epidural abscess or other dangerous emergency spinal condition.  It is, therefore, in the patient's best interest not to do additional emergent testing at this time. PLAN: continue current medications as prescribed; add prednisone taper; follow up with on-site provider in 1 week.

(Id. at 30). Brandon asserts that this was the only time he evaluated Walls. (Brandon Decl. ¶ 5, ECF No. 21-9).

Brandon states that he "performed a thorough physical evaluation" to determine if Walls needed urgent or emergent care. (Id. ¶ 6). He noted a paraspinal muscle spasm in the right lumbar area without vertebral tenderness, redness of the skin, swelling, or crackling or grating sound caused by bones rubbing against each other. (Id.). Walls had normal bilateral movement of the thigh, normal knee extension, normal dorsiflexion of the ankle, normal bilateral "point great toe up," as well as normal reflexes in the knees and bottoms of his feet. (Id.). Brandon observed no acute distress, injury, or vertebral tenderness after testing vertebral levels from L1 through S5. (Id.). Based on his examination of Walls, Brandon determined that there was no need for emergent medical care because Walls had a normal detailed neurologic exam and a "low red flag score." (Id. ¶ 7). Because Brandon did not discern any need for urgent or emergent care, he did not believe Walls required an MRI at that time. (Id. ¶ 8). Brandon adds that beyond assessing whether Walls needed urgent or emergent care, he did not play a role in the treatment of Walls' back pain and deferred to chronic care providers to assess any need for an MRI. (Id.). Brandon further explains that only Utilization Management may approve an MRI after a request for one is submitted. (Id. ¶ 9).

On December 20, 2023, Walls had a provider visit with Teweldebrhan. (Medical Rs. Part 1 at 33). Walls reported having pain on the right side of his lower back with pain radiating to his right foot and thigh, described as numbness and shooting pain. (Id.). Walls told Teweldebrhan that he could not walk long distances, bend, or exercise because those actions aggravated his pain. (Id.). At the time, Walls had not had any fevers, chills, night sweats, focal weakness, paresthesia, saddle anesthesia, bowel incontinence, or urinary

retention/incontinence. (Id.). The December 13, 2023 x-ray showed mild multilevel disc degeneration and facet arthrosis, without acute fracture or evidence of spondylolisthesis.[3] (Id., see also id. at 35 (x-ray results)). Teweldebrhan notes that a "[t]riad of treatment with baclofen, prednisone, ibuprofen and topical analgesics didn't help." (Id. at 33). Walls declined PT because it did not help him when he did it before. (Id.). According to the record, Teweldebrhan referred Walls to pain management, but there are no records indicating this referral resulted in an evaluation of Walls for treatment of chronic back pain. (Id.). Walls indicated that he was "willing to try any other meds that he hasn't tried" and agreed to try Pamelor, also known as Nortriptyline. (Id. at 35). At this time, he was receiving acetaminophen 500 mg (2 tablets every 12 hours); ibuprofen 600 mg (1 tablet 3 times a day); Pamelor 25 mg (one tablet twice a day "for nerve pain"); Salonpas topical patch; and Voltaren topical gel. (Id. at 37–38).

On April 12, 2024, the request for an MRI was denied by Utilization Management because medical necessity was not met. (Id. at 12). Specifically, the rationale for denying the request noted that there were no red flags or progressive neurological deficits; and the neuromuscular and back examinations were described as normal. (Id.; see also Medical Rs. Part 5 at 16–17 (UM referral form)).

As to their individual involvement in Walls' care, Medical Defendants explain that each of them had limited roles in addressing Walls' back pain. Dr. Smith addresses Walls'

---

[3] This term refers to a condition where one vertebra in the spine slips forward relative to another one and can occur anywhere in the spine but is more common in the lower back.  See https://my.clevelandclinic.org (last viewed October 11, 2024).

claim that he was scheduled for an appointment with him on November 15, 2023 but was not seen. (Smith Decl. ¶ 5). Dr. Smith states that he does not have any control over scheduling medical appointments, nor does he have input into the process of escorting inmates to their appointments. (Id.). Further, Dr. Smith explains that Walls did not have an appointment on November 15; his appointment was on November 30, but Walls did not show up for the appointment. (Id.). Dr. Smith adds that he only saw Walls once on October 31, 2023 for chronic care, during which Walls discussed his back pain. (Id. ¶ 9). At that time, Dr. Smith demonstrated stretches that could help with the pain and continued prescriptions for acetaminophen, Voltaren gel, and Salonpas patches. (Id.).

Christopher Brandon explains that he was employed by YesCare as part of a team of Physicians Assistants who traveled to prisons and provided urgent or emergent care to avoid sending inmates out to hospital emergency rooms. (See Brandon Decl. ¶ 3). As a member of that team, Brandon's role "was only to assess patients for emergent or urgent medical issues." (Id.). In that capacity, Brandon saw Walls only once on December 22, 2023. (Id. ¶ 5). During that one encounter, Brandon provided a detailed examination and assessed Walls as having "unspecified, acute low back pain and found that no emergent medical care was needed." (Id. ¶¶ 6, 7).

Andrea Trowbridge is a Registered Nurse. (Trowbridge Decl. ¶ 2, ECF No. 21-10). She was the Assistant Director of Nursing at RCI from January 17, 2023 to January 20, 2024. (Id.). With regard to Walls' allegation that she refused to change out his pain medications after learning the medications were not addressing his pain, Trowbridge states that her role as an RN does not include prescribing medication, nor is she permitted to

diagnose medical conditions. (<u>Id.</u> ¶ 5). She recalls speaking with Walls when he told her he wanted Baclofen renewed. (<u>Id.</u> ¶ 7). She states that she assured Walls that she had no control over his medications; that Baclofen was not widely prescribed; and that he would be offered alternative pain medications. (<u>Id.</u>).

## C.   <u>Warden Bivens' Response</u>

Warden Bivens asserts that he played no role in Walls' medical treatment and the complaint contains no allegations against him. (Bivens Mem. Supp. Mot. Dismiss ["Bivens Mot."] at 2, ECF No. 23-1). He explains that medical treatment is provided to prisoners confined at RCI by a private medical care contractor and that he defers to the expertise of the medical staff regarding the medical care and treatment of incarcerated individuals at RCI. (Bivens Decl. ¶¶ 2–3, ECF No. 23-2).

## D.   <u>Procedural Background</u>

Walls filed a complaint in this Court on March 7, 2024 and filed supplements to the Complaint on March 25, 2024 and March 29, 2024. (ECF Nos. 1, 5, 6). Walls filed a Motion to Appoint Counsel on May 23, 2024. (ECF No. 16). Medical Defendants filed a Motions to Dismiss or, in the alternative, for Summary Judgment on July 22, 2024. (ECF No. 21). Bivens filed a Motions to Dismiss or, in the alternative, for Summary Judgment on July 24, 2024. (ECF No. 23). Walls filed an Opposition to both Motions on September 16, 2024. (ECF No. 27). Medical Defendants filed a Reply on September 30, 2024.  (ECF No. 28). Bivens did not file a Reply.

## II.    DISCUSSION

**A.    <u>Conversion</u>**

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See <u>Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See <u>Moret v. Harvey</u>, 381 F.Supp.2d 458, 464

(D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

14

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." <u>Hamilton v. Mayor of Balt.</u>, 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." <u>Ingle ex rel. Estate of Ingle v. Yelton</u>, 439 F.3d 191, 195 (4th Cir. 2006) (quoting <u>Strag v. Bd. of Trs., Craven Cmty. Coll.</u>, 55 F.3d 943, 953 (4th Cir. 1995)).

Here, the Court concludes that both requirements for conversion are satisfied. Walls was on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motions as a motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. <u>See</u> <u>Moret</u>, 381 F.Supp.2d at 464. In addition, the Clerk informed Walls about the Motions and the need to file an opposition. (ECF No. 24). Walls filed an Opposition, as well as a declaration in support of his claims. (<u>See generally</u> Pl's Resp. Opp'n Def.'s Mot. ["Opp'n"], ECF No. 27).

Because the Court will consider documents outside of Walls' Complaint in resolving Medical Defendants' Motion, the Court will treat the Medical Defendants' Motion as one for summary judgment. Warden Bivens' Motion will be construed as a Motion to Dismiss.

**B.** <u>**Standards of Review**</u>

**1.** **Summary Judgment**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. <u>See</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135, 140 (4th Cir. 2008) (quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co., LLC v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

### 2. Motion to Dismiss

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must

allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994); <u>Lambeth v. Bd. of Comm'rs</u>, 407 F.3d 266, 268 (4th Cir. 2005) (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)). Complaints drafted by self-represented plaintiffs are held to a less stringent standard than those drafted by attorneys, and courts must liberally construe these complaints. <u>See</u> <u>Johnson v. Silver</u>, 742 F.2d 823, 825 (4th Cir. 1984). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, <u>Iqbal</u>, 556 U.S. at 678.

**C.    Analysis**

**1.    Motion to Appoint Counsel**

Walls filed a Motion to Appoint Counsel citing his incarceration, his limited access to the law library, and the complexity of the issues involved in this case as grounds to support the motion. (Mot. Appoint Counsel at 1, ECF No. 16). A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one and may be considered where an indigent claimant presents exceptional circumstances. <u>See</u> <u>Cook v. Bounds</u>, 518 F.2d 779, 780 (4th Cir. 1975); <u>see</u> <u>also</u> <u>Branch v. Cole</u>, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent

claimant must present "exceptional circumstances." See Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it."  See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Ct., 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel); see also Jenkins v. Woodard, 109 F.4th 242, 247 (4th Cir. July 22, 2024) (" . . . a district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel" including "whether the plaintiff has a colorable claim" and "considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff lacks the capacity to present it.") (internal quotations omitted). Exceptional circumstances include a litigant who "is barely able to read and write," Whisenant at 162, or clearly "has a colorable claim but lacks the capacity to present it," Berry v. Gutierrez, 587 F. Supp. 2d 717, 723 (E.D.Va. 2008) (citing Waller v. Butkovich, 584 F. Supp. 909, 947 (M.D.N.C. 1984).

Review of Walls' pleadings and the issues presented in his complaint establishes that he is capable of presenting his claims clearly and the claim — that he should receive a more aggressive plan of care for his back pain — is not complex. Further, the claim is not a meritorious one. The motion will therefore be denied.

## 2.    Eighth Amendment Claim

Walls' claim against the Medical Defendants is that they violated his Eighth Amendment right to remain free from cruel and unusual punishment. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its

guarantee against cruel and unusual punishment. <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976); <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 737 (2002); <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>King v. Rubenstein</u>, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 633 (4th Cir. 2003) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991)); <u>accord</u> <u>Anderson v. Kingsley</u>, 877 F.3d 539, 543 (4th Cir. 2017).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>see also</u> <u>Anderson</u>, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834–37 (1994); <u>see also</u> <u>Heyer v. U.S. Bureau of Prisons</u>, 849 F.3d 202, 209–10 (4th Cir. 2017); <u>King</u>, 825 F.3d at 218; <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); <u>accord</u> <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. <u>See</u> <u>Farmer</u>, 511 U.S. at 839–40; <u>see also</u> <u>Rich v. Bruce</u>, 129

F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless

exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." <u>United States v. Clawson</u>, 650 F.3d 530, 538 (4th Cir. 2011) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 47–48 (4th Cir. 1977)).

Assuming that Walls' pain is a serious medical condition, the record before the Court establishes that while he was not provided with an MRI, he received x-rays, and several types of pain medication. (<u>See</u> Smith Decl. ¶¶ 7, 15; Trowbridge Decl. ¶ 7). Additionally, he was assessed medically and found to have no neurological deficits attributable to degeneration of his spine, warranting an MRI. (Brandon Decl. ¶ 6). Walls does not dispute Andrea Trowbridge's assertion that she could not effectuate any changes to his prescribed medications. (<u>See generally</u> Mem. Supp. Opp'n Defs. Mot. Dismiss ["Opp'n"], ECF No. 27-1). Given her limited role in Walls' care, Trowbridge is entitled to summary judgment in her favor.

In his Opposition, Walls faults Defendants Smith and Brandon for failing to consult his medical history and to conduct tests to determine if his pain was caused by degenerative spinal disease. (<u>Id.</u> at 5). Medical Defendants assert that Walls is impermissibly attempting to amend his claims through his Opposition, as the Complaint alleges only that Smith issued medical passes for Walls to be seen but he was never called, and Brandon assured Walls he would get a request for an MRI approved. (Reply Supp. Mot. Dismiss ["Reply"] at 4–5, ECF No. 28). Neither the claim asserted in his Complaint, nor the elaborated version

of that claim raised in his Opposition suffice to demonstrate an Eighth Amendment claim of deliberate indifference to a serious medical need. The record evidence establishes that there were no objective medical criteria to support performing an MRI on Walls' back. The medical staff who examined Walls did more than cursory examinations in response to his complaints. (See Brandon Decl. ¶ 6). The x-rays that were performed were unremarkable and did not show the loss of vertebral heights, meaning Walls did not have a herniated disc or other injury to his spine that was causing his pain. (Smith Decl. ¶¶ 7, 15). Rather, the degenerative changes appear to have been attributed to Walls' age. (See Medical Rs. Part 2 at 22).

Conservative treatment may seem dismissive of the pain Walls experienced; however, the Eighth Amendment does not prohibit conservative medical treatment where, as here, the objective medical symptoms do not support anything more. While this Court is troubled by the failure to refer Walls to a pain treatment team despite such a recommendation being noted in his record, there is no indication that the treatment he has received would differ from what has been provided. To the extent that Walls develops additional symptoms that indicate neurological compromise, medical staff is well advised to reconsider their conservative approach. Thus far, there has been no evidence of any willful refusal to find or diagnose a serious medical condition through denial of diagnostic tests. Additionally, none of the Medical Defendants were responsible for denial of the MRI, as the record establishes that only Utilization Management reviewers can approve MRIs. (Brandon Decl. ¶ 9). Smith and Brandon are entitled to summary judgment in their favor.

### 3.      Personal Participation

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Warden Bivens is named in the caption of the Complaint, but there are no allegations that he in any way interfered with Walls receiving needed medical treatment. In his Opposition, Walls asserts that Warden Bivens is liable because he "allowed his subordinates to cause Plaintiff Walls to linger for weeks in severe pain" and "prescribed medications as band aids to the treatment of his injury." (Opp'n at 6). Warden Bivens does not supervise medical staff, nor is his role to second-guess medical decisions formed after

clinical observations by medically trained personnel. (Bivens Decl. at 1). Correctional personnel typically are not liable for deliberate indifference when they allow the medical staff to make decisions about medical care. See Miltier v. Beorn, 896 F.2d 848, 854–55 (4th Cir. 1990) (noting that a warden was entitled to rely upon the health care providers' expertise); Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (stating that "[i]f a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands"); Shelton v. Angelone, 148 F.Supp.2d 670, 678 (W.D.Va. 2001) ("Prison personnel may rely on opinion of the medical staff as to the proper course of treatment."). Warden Bivens' participation is limited to his attempt to intervene on Walls' behalf; after medical staff became involved, Bivens did not participate in the diagnosis and treatment of Walls' condition. (Bivens Decl. at 1–2). He is entitled to dismissal of the claim against him.

### III.   CONCLUSION

For these reasons, and by separate Order which follows, the Court will deny Walls' Motion to Appoint Counsel (ECF No. 16). The Court will grant the Medical Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, construed as a Motion for Summary Judgment (ECF No. 21), and the Court will grant Bivens' Motion to Dismiss or, in the alternative, for Summary Judgment, construed as a Motion to Dismiss (ECF No. 23). Entered this 5th day of November, 2024.

_____
/s/
George L. Russell, III
Chief United States District Judge